Good morning. May it please the Court. Steve Locher on behalf of the Plaintiff and Appellant FastPath. This case presents what I believe to be a fairly unique question of personal jurisdiction. And the question is this. When a California company reaches out to an Iowa company and negotiates a mutual covenant not to compete as part of a larger contract between the two sides, and that covenant will not, under any circumstances, be enforced by a court in the State of California, isn't it fair to say that that California company... Which I don't think is established by any means. And perhaps not, but I certainly would argue that it is established and that California courts have been very clear that in a situation like this they will not enforce the covenant not to compete and also that they will not enforce a choice of law provision. I also suspect from many years of litigating restrictive covenants that this one would be considered unenforceably overbroad anywhere. What relevance would that have? Well, ultimately I would say that it would have very little or no relevance, and here's why. In California, because of this statute that... Well, all that means is that California wouldn't enforce it, but neither would anybody else. Well, except for this. In the State of Iowa, which I would argue is much more permissive to covenants not to compete than California is, I think at a minimum the parties would have recognized at the time they entered the contract that they had a better chance of it being enforced in Iowa than in California, and that's one thing that would certainly matter. In addition to that, unlike courts in California, which can't modify or amend or blue-pencil covenants not to compete that are overly restrictive, courts in Iowa do have the power to amend or modify covenants not to compete if they find them to be overbroad. So, again, I think a strong argument can be made that the parties recognized at the time they entered this agreement that they were better off in Iowa court and had a better chance in Iowa court of having this thing enforced than in California where there's a categorical prohibition on this sort of thing. But there's not a forum selection clause. If they really wanted to be in Iowa, couldn't they have included that as opposed to just a choice of law clause? A forum selection clause certainly would make this an easy case, Your Honor, but of course there have been a number of cases both in this court. Wouldn't have been agreed to. Well, that's hard to say. I don't know if it would have or not. Well, your assertion as to what the parties intended on a 12B6 record is a bit much. Maybe so, but parties are presumed. From the negotiating history as described, I would say that the mutuality of this was sort of a defensive reaction. It certainly was not something enthusiastically desired by the defendants. Except, though, Your Honor, that parties are presumed to know the law. And here, a company that – Don't push that one too hard. Well, the only reason I push it is because the Supreme Court, I would argue, recognized that very principle. Negotiators aren't lawyers. Yeah, put in a forum selection clause. As I said, that certainly would have made this a simple case, but there have been plenty of cases. So if lawyers are supposed to know the law, that means they understand the nuances of personal jurisdiction also. Except that – And perfectly anticipated the Supreme Court's decision in Walden. In Walden, I would argue, is very, very different because that's a tort case. I'm sure, but I don't understand why. Let me try to get there, but let me start by picking up just one last thought on your first point. This court and the Supreme Court have both exercised personal jurisdiction in many situations where there was no forum selection provision in a contract. That was true in the Burger King-Rudsowitz case, the McGee case. Out of this circuit, the Wessels case, the Wells Dairy case, the 3M case. Well, in those cases, things actually happened in the forum state. I mean, nothing really happened in Iowa, did it? I mean, they were in Washington. They were in Texas. They were lots of places. In terms of the face-to-face meetings, that's true that they happened in other places. But there still was ongoing obligations and continuing obligations in the state of Iowa. And in particular, Fast Path, my client, was governed by this non-compete. And as an Iowa company, their compliance with that non-compete was going to take place in the state of Iowa where they're located. And that is a continuing obligation. And that's something that I would argue this court recognized, again, in the 3M case. 3M in that case had agreed not to pursue lawsuits. And this court said that by agreeing not to pursue lawsuits and by being based in the state of Minnesota, that was a continuing obligation in the state of Minnesota. And I would argue that the same thing applies here, that by agreeing not to compete, Fast Path was imposing continuous obligations on itself in the state of Iowa. And those continuing obligations were certainly something that Arbella received the benefit of. And having received the benefit of those restrictions. That's pled? The benefits are identified in the pleading? I think an inference can certainly be drawn from the pleading that Arbella was aware and wanted Fast Path to be restricted by this covenant not to compete. But you put it in terms of actual benefits, not contemplate. Well, when Arbella negotiated the covenant not to compete and asked for Fast Path to be governed by it, and that is in the pleading and it's in the declarations, actually. But because that's in the record. That was their counterproposal, right? Correct. And Fast Path agreed to it. And, of course. I understand all that. But the argument becomes quite fictional. I hope not. And I'll certainly try to convince you otherwise. You're on the pleadings, and so that's fine. This was a covenant which is common when parties are contemplating a possible merger. And we're going to let you look at our book, so you've got to agree to keep it confidential. Right. That was the idea. As I understand the facts, maybe this is, I don't know if this goes beyond the 12B6, but there was no merger talk. This covenant was a non-event from the moment just after the ink dried. I don't think the record would agree with that. It existed, but the purpose for it died. And, actually, if you look at the record, and if you look in particular at the declaration that my client submitted, there was a lot of information shared by Fast Path about its products and methodologies with this other party. Can I go back to something you raised earlier? You've argued that this would never be enforced in California, and I understand that argument. Why are you limiting it to California and Iowa as the only choices? Things happened in Washington State. They happened in lots of other places. Do we have to decide that Iowa is the only state in the nation that would, for your purposes, we have to assume that it's the only state in the nation that would enforce this? You don't have to assume that at all, Your Honor. What I would ask the Court to assume and conclude is that, given what I believe is a clear prohibition in California on covenants of this nature, that Iowa was by far the most logical alternative in terms of what the parties expected for where this thing was going to be enforced. Well, but there's this seminar where supposedly they got some information, right? There was some webinar or something going on in another state. Why wouldn't that have been the forum? I mean, if you could have jurisdiction there, why wouldn't you use that one? And doesn't that hurt your argument? The question is if you could have jurisdiction there. And given that neither party was from Washington or from any of these other states where the contacts happened, I think jurisdiction over Arbella and those states would be a pretty tough sell. In fact, I think it would be a much tougher sell than jurisdiction in the state of Iowa. And so, again, trying to analyze what the parties intended at the time they entered the agreement in June of 2012, given that it's between a California company and an Iowa company and that Iowa company does basically all of its activities in the state of Iowa, I think the only logical inference is that Arbella knew that it was likely to be subject to litigation in the state of Iowa and, in fact, wanted that because that's how they could enforce it against Fast Path as well. So I don't think you have to conclude that Iowa is the only forum, but I would argue that Iowa is the most logical forum. You've made a lot in your briefs about Arbella being the aggressor in this or being the ones who went after it. And I wonder, doesn't the recent Supreme Court case in Walden v. Fiore sort of show that that's not really a very important factor? Because, obviously, the aggressor in that case was the DEA. Right, but I want to make a distinction that I think the Supreme Court has recognized on many occasions and will continue to recognize even after Walden, and that's a distinction between breach of contract cases, like the one we're dealing with today, and tort cases. In a tort case, and that's what Walden was. These same principles apply when intentional torts are involved, followed by a lengthy discussion of Calder v. Jones. Right, intentional torts. And we're talking about a breach of contract claim here in a situation where the parties, at the beginning of their contractual relationship, and this is, in my view, the important difference. In a tort case, you're looking- But it's a contractual case. I thought you were getting at the tortious nature of unfair competition. Well, it's a breach of contract case, which means that- Walden's a contract case. Walden was not a contract case. Walden was a tort case, an illegal search and seizure case. All right, but the relationship is based on contract. The form- I don't read Walden in that way, Your Honor. I read that as being purely a tort case arising out of an illegal search and seizure outside the form state. And why were you saying there's a distinction? I mean, you said there's a- The distinction is because in a contract case, you have a data point that you can look at at the time the parties entered the agreement to figure out what they expected and what they anticipated. A tort case is different. You're looking at it after the fact. And let me read some language from the Burger King-Rudziewicz case, which I think addresses this exact issue. The court said, in criticizing an argument by the defendant that he'd never been in the form state, the court said, This reasoning overlooks substantial record evidence indicating that Rudziewicz, the defendant, most certainly knew that he was affiliating himself with an enterprise based primarily in Florida. And then it goes on to talk about how the contract documents emphasize that the plaintiff was located in the state of Florida. And that's part of what makes a contract different than a tort case. In a tort case, looking after the fact and trying to figure out whose law is going to apply or what the parties intended- You know how Burger King is described in Walden. For example, entering a contractual relationship that envisioned continuing and wide-reaching context in the form state. That's how the unanimous court described and inferentially limited Burger King. And I would argue that there were continuing obligations imposed here in the state of Iowa on FastPath. Not context. Well, there were some additional context. I admit there weren't as many as there were in the Burger King case. After the contract was signed? Sure. What context? Phone calls, e-mails, FastPath- Relating to these things in Washington? Oh, absolutely. Well, relating to the breach of the covenant not to compete in particular. In February of 2013, there were both phone calls and e-mails about the customer that- I can imagine who initiated those. Actually- The aggrieved party. Well, at the time, it was actually Arbella, the defendant, that initiated them and basically said to FastPath, show us what you're showing to this customer. We want to see what you're showing them. And FastPath was willing to do it because they thought they were going to be under the protection of this confidentiality agreement and then learned that Arbella was actually pitching its product as an alternative, as a competitor to FastPath's product, and that's what led to this lawsuit. But ultimately, even that communication was initiated by the defendant, by Arbella. So I've only got three minutes left, and I'd like to save the rest of my time for rebuttal. Ms. Jansen? May it please the court. My name is Amanda Jansen of the Ahlers & Cooney Law Firm in Des Moines. I'm here today representing Arbella Technologies Corporation, which is a California company that has never set foot in the state of Iowa, ever. Arbella does no business in Iowa, sells nothing in Iowa, ships nothing to Iowa, sends nothing to Iowa, buys nothing from Iowa. And those facts distinguish this case from almost every other Eighth Circuit and United States Supreme Court case decided to date. Certainly, physical presence is not required. There's cases that say that, but it certainly seems to help significantly. In fact, I can't find a single Supreme Court or Eighth Circuit case where jurisdiction has been exercised, where there hasn't been some kind of physical entry into the forum state. Even in the Wells Dairy case, which FastPath relies on extensively, while nobody from Food Movers International actually entered into Iowa, they were having their customers serve as agents for them in picking up the product. So if their agent is in Iowa, that's their physical presence in Iowa. In addition- Didn't that case also, I'm not sure if it was that one, maybe some others in the Eighth Circuit, talk about the fact that both the choice of law provision being an important factor for the court to consider and also the idea that who was initiating contacting and coming in as both important factors? Yes, they're both factors. How important they are, I think, remains to be seen, because subsequently after Wells Dairy, we have the Dairy Farmers of America case. In that case, reliance was urged upon Wells Dairy, and the court even acknowledged that, yes, the defendant in Dairy Farmers initiated and pursued the relationship, but that wasn't enough to carry the date. It simply can't turn on who made the first contact, who called who first, who shook whose hand at a trade show booth in some state. It can't turn on something so attenuated and random and fortuitous as who started it, essentially. And on that point, one thing I wanted to note was while Arbella may have initially emailed FastPath first, that's not what we're here fighting about. We're here on a breach of contract case, and it was FastPath who proposed the contract and sent that to Arbella. They initiated the contract that's the subject matter of the action. It's important to focus on what's actually really important for purposes of the case. I also think that it's important to point out what the purpose of the contract was. As Judge Loken rightfully pointed out, it was merely a precursor to another agreement to possibly enter into some kind of a merger or other partnership joint venture transaction. In fact, the contract is clear. It says this contract is solely for the purpose of evaluating and negotiating a possible relationship of that nature. Mr. Loker has alleged that there was confidential information actually shared by FastPath pursuant to this agreement. I don't think the record supports that at all. Mr. Snook's affidavit is very carefully drafted so as to not say, hey, we shared confidential information with Arbella. He simply says they were at these conferences in Washington, and without the contract, I never would have allowed him to sit in on that, or I never would have allowed him to pass out his business cards. But that conference in Washington, I mean, this is a public exhibition. It's not something that was put on by FastPath specifically for its customers. And importantly, not for nothing, it was in Washington, not in Iowa. The purpose of the contract has nothing to do with Iowa. What about the execution of the contract? FastPath argues that formalistically, because the last party to sign was FastPath, and that was allegedly in Iowa, although there's no record evidence as to the place of where he signed it, that that makes all the difference. The contract was accordingly, arguably executed in Iowa. Well, that's been tossed by the wayside long ago. The Supreme Court and this court have been very clear that personal jurisdiction does not turn on formalistic, conceptualistic theories about the place of contracting. And really, that's what FastPath's argument boils down to here, is a bunch of conceptualistic legal fiction theories piled one on top of the other, presumption of the law. They must have known that California law wouldn't have enforced it, or California courts wouldn't enforce an Iowa choice of law provision. Let me ask you a question. In your briefs, you argue that that's not necessarily true, that California might have enforced it. Can you elaborate on that? Do you think this is enforceable in California? The simple answer is I don't know. I'm not a California lawyer, and I'm not a California court, but I don't think that it's established as conclusively as FastPath would have this court believe, and it's their burden to prove that there's no other forum besides Iowa to litigate in. And as has already been raised here today, California is not the only other choice. The parties themselves have met repeatedly in other states. Georgia, Washington is in the record, Texas. There's no reason to assume that there couldn't be jurisdiction in any of those states. Today it was suggested, well, maybe the court of Washington wouldn't have jurisdiction over Arbella and Washington. Well, if Arbella goes to Washington to sue FastPath, they're submitting to the jurisdiction of Washington. I mean, that's a no-brainer. It's all about consent. And, in fact, that's what the whole principle of why are we looking at all of these activities. That's why it matters. Are you manifesting consent to submit to the power of the sovereign? That's how the Supreme Court explained it in the Jay McIntyre case. And, in this case, all we have really is an Iowa choice of law clause, not a forum selection provision. And the choice of law clause simply is not enough to manifest an intent on Arbella's behalf that it submit to the sovereign power of the state of Iowa. The reason is that there are other courts that would enforce a choice of law provision. There's also some discussion in the briefs about, well, this contract was to be performed in Iowa. It's kind of an interesting case because there's no affirmative duties by either party to do anything. It's a restrictive covenant. And so the nature of the performance is to not do anything. Don't compete. Don't share our confidential information. So the performance is to refrain from doing things. Well, there's no geographical limitation to where that's going to take place. That's worldwide. Don't compete with me anywhere in the world. Don't share my confidential information anywhere in the world. Yes, because FastPass employees have offices in Iowa. By necessity, some of that performance was bound to take place in Iowa. But there's nothing special about the fact that they're in Iowa. The contract didn't specifically call, don't share our information in Iowa. Don't compete with us in Iowa. So it's just this is exactly the kind of random, fortuitous, attenuated contact with Iowa that the Supreme Court has been clear is not enough. What we're looking for is a substantial connection. Substantial. If this is substantial, I don't know what insubstantial might be. You need to compare and contrast. In this case, it's just these inferences piled upon one another, the presumptions. But as has been pointed out, these are businessmen. They're not legal scholars. They're not Supreme Court justices or Eighth Circuit judges. This is a businessman in California who is in receipt of a one- Hopefully not those who drafted the contract. That's right, Your Honor. Arbella's contact person is in receipt of a one-sided covenant. Here, by the way, this is you can't compete with us, but it's only one-sided. Well, it's just common sense. I mean, you don't need to be a lawyer or know anything about the law. Not for nothing, the title of the contract is Mutual Confidentiality Agreement. To make a one-sided covenant mutual. It just makes sense. It's parity. It's a natural desire for proportionality, especially when you're signing something that's called a mutual agreement. Well, let's make it mutual. So I think it just reads way too much into the fact that there's a one-line email that says, Hey, can you please make Paragraph 11 mutual instead of one-sided? From there, it takes legal gymnastics to get from that action to consent on behalf of a California corporation, who's never been to Iowa, never done anything in Iowa, to be sued in Iowa. You just can't get there. It's not about foreseeability of litigation in the forum. That's been discounted and tossed aside by this court and the Supreme Court. Foreseeability is not the test. It's reasonable anticipation. Okay? So you can foresee being sued anywhere. That can happen in this day and age with the Internet and the prevalence of electronic and virtual contacts. But it's whether that would be reasonable. In this case, it simply is not. The webinar. That is the conduct alleged by FastPath to be the breach. That's the webinar where, according to the petition and the declaration of FastPath's principle, that's where they learned that Arbella was allegedly marketing and selling this allegedly competing product. Well, no evidence that that came from Iowa or that that took place in Iowa. There's no evidence as to where the webinar originated from at all, but it's probably safe to assume that it originated from Arbella's offices in California, since that's where they primarily do business. But that fact, it really doesn't make any difference that FastPath attended that webinar in any event, because that's the unilateral activity of them, the plaintiff, to dial into this webinar that's available on the Internet to anybody who wants to register and call in for it. It's no different from a physical seminar that's open to everybody. If FastPath decides to get on a plane and fly to California and attend some webinar, well, that can't be attributed to the California company. They didn't pay for the plane ticket and invite them to come out to California, as was the case in one of the decisions relied upon by FastPath, the Madison Consulting case, which first and foremost is a Seventh Circuit decision and is therefore not binding in any way, shape, or form on this case. There are plenty of Eighth Circuit decisions that are right on point without any need to step outside of the circuit and look at other courts' decisions on these difficult matters. Specifically, the Dairy Farmers of America case, that's all you need to read to decide this case. All of this in the arguments, which that's what they are, is arguments of counsels about aggressive pursuit, aggressively pursuing them and relentlessly seeking out this relationship. First, we'd ask the court to really look beyond that characterization, the argumentative characterization of aggression, and look at what they are. The e-mails are in the record. They're in the appendix. Half of them are completely ministerial e-mails like, when's a good time to set up this conference call? How's your schedule look in the second week of June? Really nothing substantial about those, and yes, there are a few of them. Does that make it aggressive? I don't think so. There's no browbeating. This is not the kind of aggressive marketing that I receive from the cable company or numerous other people that are trying to sell me this, that, or the other thing. It was a couple e-mails touching base, hey, I think we should talk. And in any event, it makes no difference at the end of the day because this court has said in Dairy Farmers that that can't be enough. Just who solicited the business, even if they knew that the solicitee had headquarters in the forum state, that's not enough. Actually, I talk about the limited record, but this was a 12-D1 dismissal. Yes, it was. So the fact record is as extensive as the parties chose to make it. That's true. There was no jurisdictional discovery requested by the plaintiff. There are just the declarations and the exhibits to the declarations, but it's really all that's there. There's nothing more that you could necessarily find out from jurisdictional discovery because we have a limited relationship consisting of a maximum of 10 e-mails, half of which, as I mentioned, are ministerial and trying to set up this conference call. A single one-time 30-minute conference call. I wasn't suggesting anyone ask for more. Sure. I was thinking 12-B6, but that was wrong. No, it was dismissed on just the lack of personal jurisdiction, and Judge Pratt really wrote a very well-reasoned decision considering all of these very creative and novel arguments and cogently stated the reasons why they should each be soundly rejected. It's been kind of a follow-the-bouncing-ball task in this case. I feel like the argument has changed course a few times, and arguably the way it's being argued here on appeal is significantly different from the way it was argued below. Below it was simply, well, there's a choice of law provision. There's the contacts via e-mail and at these conferences. And then we've got the forum unavailability. Those were the only things that were advanced below. Now it's kind of morphed into this, well, you have to presume that they knew the law and you have to presume that California wouldn't apply an Iowa choice of law provision. You have to presume that there's no other place in the country they can be sued. That's a little bit different than the way it was below. In summary, just to wrap up here, if this case is reversed, it will be the first time that a company from out of state has been hailed before the forum on the basis of a contract. It's been resoundingly rejected that just having a contract by itself with nothing particular about the performance there under or the negotiations leading there to that has a substantial relationship with Iowa. This is the epitome of an attenuated, fortuitous contact with Iowa, and for those reasons the decision below should be affirmed. Thank you. Thank you. Mr. Volker, do you have some time? He does, Your Honor. Two minutes and 57 seconds. Thank you. May it please the Court. There have most certainly been cases where a defendant had no office, no employees, no physical presence in a particular state, and yet courts have found jurisdiction to exist, and the Burger King v. Rudowitz case is one very simple example of that. The defendant in that case had never set foot in the state of Florida in connection with that agreement and yet was subject to jurisdiction there. The result in McGee was the same. In terms of whether Arbella was the aggressor or not in the relationship, I think the factual record is clear that they were, but even if there is some dispute on that, that's a dispute that has to be resolved in our favor at this stage of the case. What FASTPATH has to establish is a prima facie case of the existence of personal jurisdiction because there wasn't an evidentiary hearing, because it was just decided on the pleadings and affidavits. All we have to do is establish a prima facie case, and our allegations need to be taken as true. Here we have alleged, with considerable support, that it was Arbella that was the aggressor in trying to initiate a business relationship with FASTPATH. Tell me how you respond to the argument about the place of performing a contract when the performance is don't do something. I mean, how can you say that the place of performing that contract would be Iowa? I would direct you to the 3M case that the Eighth Circuit decided in the mid-1990s. The obligation on 3M in that particular case was not to file a lawsuit, so it was a negative covenant. And this court concluded that that obligation was going to be performed and carried out by 3M in the state of Minnesota because that's where 3M was located. So that's what I would rely on. And the idea that the contacts with Iowa were somehow attenuated or random, I strongly disagree with that. I think that reaching out to an Iowa company to try to establish a business relationship, then entering a contract with them, then asking them to be bound by a covenant that they're going to comply with in the state of Iowa, and then agreeing to an Iowa choice of law provision to govern that agreement, that's not random or attenuated in my view. That's very intentional and deliberate. And I conclude in terms of this choice of law question and whether we're engaged in legal gymnastics with a quote from the United States Supreme Court in the Keaton v. Hustler magazine case. It says, certainly Hustler magazine, which chose to enter the New Hampshire market, can be charged with knowledge of its laws and no doubt would have claimed the benefit of them if it had a complaint against a subscriber, distributor, or other commercial partner. What we're asking for here is for the court to apply exactly that same principle to our bellis. Certainly by reaching out to Iowa, entering a contract with an Iowa company in a situation where California's laws, we believe, weren't going to enforce it, but an Iowa court would, that's a purposeful act to obtain the protections and benefits of the state of Iowa, and it's the kind of thing that should subject our bella to personal jurisdiction in the Southern District of Iowa. Thank you very much. Thank you, Counsel. The case has been well-briefed and argued, and we'll take it under advisement. And the court will be in recess until 8 p.m.